IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 13-cv-01353-RBJ

RENE JESUS GARCIA, aka Jesse Garcia,

      Plaintiff,

v.

CAROLYN COLVIN, Acting Commissioner of Social Security,

      Defendant.

---

## ORDER

---

      This matter is before the Court on review of the Commissioner's decision denying plaintiff Rene Jesus Garcia's application for disability insurance benefits and supplemental social security income pursuant to Titles II and XVI of the Social Security Act.  Jurisdiction is proper under 42 U.S.C. § 405(g).

### STANDARD OF REVIEW

      This appeal is based upon the administrative record and briefs submitted by the parties. In reviewing a final decision by the Commissioner, the role of the district court is to examine the record and determine whether it "contains substantial evidence to support the [Commissioner's] decision and whether the [Commissioner] applied the correct legal standards." *Rickets v. Apfel*, 16 F. Supp. 2d 1280, 1287 (D. Colo. 1998).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wilson v. Astrue*, 602 F.3d 1136, 1140 (10th Cir. 2010) (citations omitted).  Evidence is not substantial if it "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

1

The Court "may neither reweigh the evidence nor substitute [its] judgment for that of the agency." *Harper v. Colvin*, 528 F. App'x 887, 890 (10th Cir. 2013) (citations omitted). Thus, although some evidence could support contrary findings, the Court "may not displace the agency's choice between two fairly conflicting views," even if the Court might "have made a different choice had the matter been before it de novo." *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). However, the Court must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007) (citations omitted). A decision cannot be based on substantial evidence if "it is overwhelmed by other evidence in the record. . . ." *Bernal v. Bowen,* 851 F.2d 297, 299 (10th Cir. 1988).

Upon review, the district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 45 U.S.C. § 405(g).

## BACKGROUND

### 1. **Procedural History**

Mr. Garcia first applied for disability insurance benefits and supplemental security income on March 18, 2010. He claimed inability to work since his alleged onset date of October 10, 2003 due to a fractured left ankle, torn MCL, and back problems. R. 239. The Commissioner denied Mr. Garcia's application on August 20, 2010. Mr. Garcia then requested a hearing before an administrative law judge (ALJ), which occurred on November 15, 2011, in Denver. On February 2, 2012, ALJ Lowell Fortune issued an opinion denying benefits. The Appeals Council denied Mr. Garcia's request for review on April 18, 2013. Thereafter, Mr.

Garcia filed a timely appeal with this Court.

2. **Medical History**

Mr. Garcia worked in oil and gas drilling from 1988 to 2003.  R. 241.  On October 10, 2003 he was working on an oil rig when it tipped over and he jumped, falling approximately fifteen to twenty feet and fracturing his ankle.  R. 637-38.  On October 30, 2003 Dr. Craig Miller performed an open reduction and internal fixation of a left distal fibula fracture with excision of delaminated chondral injury of the lateral talus.  R. 341.

On November 19, 2003 Mr. Garcia complained that his toes were turning purple and swelling up.  R. 565.  Dr. Miller believed he was experiencing normal postoperative swelling and that he would probably be able to resume walking in a few weeks.  *Id.*  He was also suffering from persistent knee pain and low back pain, which Dr. Miller attributed to his altered gait.  *Id.* On December 10, 2003 Dr. Miller obtained radiographs of the left ankle which showed the fracture had healed nicely.  *Id.*  However, there was more osteopenia (lower than normal bone density) than expected, and Dr. Miller recommended physical therapy for scar desensitization and whirlpool treatments.  *Id.*  After a follow-up appointment on January 20, 2004 Dr. Miller noted that Mr. Garcia was having "quite a bit of problem with the pain," and that he might have developed complex regional pain syndrome as a result of the injury.  R. 638.

Thereafter, in response to the ankle, knee, and lumbosacral pain, Mr. Garcia began seeing Dr. Jeffrey Kesten.  R. 637–38.  On December 30, 2003 Dr. Kesten prescribed Tylenol and Ultram and referred Mr. Garcia to a physical therapist for 12-sessions, which were completed. R. 566.  He also referred Mr. Garcia to a psychotherapist, but Mr. Garcia declined due to feeling uncomfortable after a phone conversation with the therapist.  *Id.*  He was also taking Celebrex at this time, prescribed by Dr. Miller.  *Id.*

At another appointment with Dr. Kesten on February 23, 2004 Mr. Garcia was still ambulating with use of a right Lofstrand crutch.  *Id.*  He reported experiencing paresthesias over the lateral aspect of his left foot, and although he was "deal[ing] with" the lumbosacral pain, it was still preventing him from doing anything.  R. 566–67.  Furthermore, he exhibited "marked left calf atrophy" and a "significant distal lower extremity color asymmetry."  R. 567.  Dr. Kesten measured his active range of motion for the left ankle at "plantarflexion 27 degrees, dorsiflexion -2 degrees, inversion 12 degrees, and eversion 0 degrees."  *Id.*  His active range of motion for the left knee was "[f]lexion 140 degrees and 5 degree extension lag."  *Id.*  His lumbosacral range of motion was "[f]lexion 80 degrees, extension 10 degrees, right lateral flexion 50 degrees, left lateral flexion 35 degrees,  right rotation 60 degrees, and left rotation 50 degrees."[1]  *Id.*  Dr. Kesten discontinued his prior prescriptions and commenced a trial of Bextra.  R. 569.  He also prescribed use of a single-point cane, prescribed an additional twelve sessions of physical therapy, and instructed Mr. Garcia to remain off work and perform his independent home exercise program daily.  *Id.*

On May 25, 2004 Mr. Garcia received x-rays at St. Anthony Hospital.  R. 337.  The Radiology Report shows "[n]o fracture, dislocation, or other acute traumatic bony abnormality," nor does it reveal any "degenerative changes, or destructive abnormalities" in the left knee, finding that the knee was normal.  *Id.*  The study did result in an "[a]bnormal three-phase bone scan of the left foot and ankle, with abnormal activity in all three phases," and the radiologist, Dr. Paul Danner, opined that these conditions could be post-traumatic.  R. 338.

Dr. Kesten's next evaluation in the record is from November 9, 2004.  R. 546.  At this point in time, Mr. Garcia stated that "the pain [was] so bad, [he couldn't] even sleep."  R. 547.

---

[1] Dr. Kesten performed range of motion tests at every follow-up evaluation with Mr. Garcia.  The record shows great variation in measurements throughout the years, a factor the ALJ relied upon in his credibility determination.  However, in the interest of brevity, I do not repeat those results in this order.

Since the aforementioned February appointment, Dr. Kesten had prescribed a sacroiliac belt, New Balance tennis shoes, and use of a 4i Stimulator, from which he said he was benefiting greatly. *Id.* Dr. Kesten also advised him to enroll in a course of pool therapy/whirlpool therapy, but he had not done so. *Id.* While his knee was "killing him," he reported getting relief from a MalleoLoc brace. *Id.* He had also gone on a trial of Lodine XL, which he said provided no benefit. R. 546. Further, he had attended three psychotherapy sessions with Dr. Disorbio, which he found helpful. *Id.* He displayed severe pain behavior with a markedly antalgic gait and moderate to severe grimacing during the range of motion measurements. *Id.* At this point Dr. Kesten discontinued the Lodine XL trial, instructed him to continue taking Protonix, and started him on a trial of oxycodone. R. 550.

At this time there is a nearly three-year gap in the record. Documentation from the next appointment with Dr. Kesten, on May 1, 2007 indicates that Mr. Garcia spent some time incarcerated during this gap. R. 572. Specifically, he was imprisoned from February 17 to May 1, 2005 and later violated his probation by driving without a license, resulting in his being returned to jail for an additional four months. *Id.* Further, he struggled with an addiction to methamphetamine during that period but alleged that he had been clean for nineteen months. R. 573. Dr. Kesten also noted that Mr. Garcia showed inconsistent pain behavior while in the waiting room as compared with his presentation in the examination room at his last appointment in December 2004. R. 572.

However, at this appointment, Mr. Garcia still reported severe pain in his lumbosacral region and lower left extremity. R. 573. Moreover, he described a constant sensation of tingling and numbness affecting his toes and distal forefoot. *Id.* He was benefiting from a left polypropylene ankle-foot orthosis, but his only medication at this point was ibuprofen. R. 572–

5

74.  He was unable to heel walk across the examination room and markedly struggled to toe walk.  R. 573–74.  Dr. Kesten further noted that his left foot was "grossly cooler" than his right foot.  R. 574.  At this point he had been released to full-time employment without restrictions yet remained off work.  *Id.*  Dr. Kesten noted that he would have one more opportunity to pursue the recommended treatment plan, but if he were noncompliant, he would be deemed to have achieved Maximum Medical Improvement ("MMI"), without permanent impairment, on January 17, 2005.  R. 572.

At the next evaluation on October 31, 2007 Dr. Kesten put Mr. Garcia on a prescription of Vicodin.  R. 578.  He also referred him to undergo an MRI of his left knee, which was performed on November 6, 2007.  *Id.*  The results were "[e]ssentially normal."  R. 579.  It did reveal a questionable area of abnormal signal intensity in the body of the medial meniscus, but that was likely related to vascularity.  *Id.*  It further revealed a small ganglion cyst adjacent to the distal ACL that was unlikely to be of clinical significance.  *Id.*

Mr. Garcia's next evaluation came on November 29, 2007.  R. 578.  He was still walking with the assistance of a single point cane in his right hand.  *Id.*  He had replaced his polypropylene ankle-foot orthosis with an improved custom solid-spiral ankle-foot orthosis.  *Id.*  He reported that his pain was worse because he was "doing more activity than [he] should."  R. 579.  Dr. Kesten instructed him to recommence taking ibuprofen and continue with the Vicodin, the orthosis, and the cane.  R. 581.

Mr. Garcia underwent diagnostic/therapeutic left lumbar sympathetic blocks on October 26, 2007 and January 18, 2008, both performed by Dr. Brad Vilims.  R. 584.  However, he received no benefit from these procedures.  *Id.*  In the interim between those procedures, he was again incarcerated from December 6, 2007 to January 15, 2008.  R. 583.  In his next follow-up

with Dr. Kesten on January 23, 2008 he was still ambulating with use of a single point cane in his right hand and wearing the new left custom solid spiral ankle-foot orthosis, which was not helping as much as his former polypropylene orthosis.  R. 583–84.  He stated that his lumbosacral region had severe pain at the site of the sympathetic block injection, his knee was "killing [him]," and his ankle was "cold as heck."  R. 584.  Dr. Kesten instructed him to keep taking Vicodin and ibuprofen and to remain off work.  R. 587.

On March 28, 2008, Mr. Garcia underwent an orthopedic surgery consultation per Dr. Douglas Straehly.  R. 589.  Dr. Straehly decided that, "[g]iven the fact that [Mr. Garcia's] symptoms are more of a nuisance to him and not substantially interfering with the quality of his day-to-day life, and in light of the fact that this will not result in further damage to the joint," surgery was not necessary.  R. 590.  However, at his next evaluation with Dr. Kesten on April 24, 2008, Mr. Garcia stated that he couldn't sleep due to his back pain, and that he had coldness and "pins and needles" up to his knee.  *Id.*  At this point Dr. Kesten discontinued Mr. Garcia's Vicodin prescription and instead started him on a trial of Kadian.  R. 592.  He instructed Mr. Garcia to stay off work and to continue with the rest of his interventions—the 4i Stimulator, sacroiliac belt, New Balance tennis shoes, and left custom solid spiral ankle/foot orthosis.  *Id.*

Mr. Garcia's next evaluation with Dr. Kesten took place on May 19, 2008.  R. 594.  He was still ambulating with use of a single point cane in his right hand and wearing a left custom solid spiral ankle/foot orthosis.  R. 595.  Dr. Kesten instructed Mr. Garcia to discontinue the Kadian trial and commence an Opana ER trial, while continuing other previous interventions and remaining off work.  R. 598.

Mr. Garcia was still reporting and demonstrating severe pain at his next evaluation with Dr. Kesten on June 12, 2008.  R. 702.  He was also still ambulating with use of a single point

cane in his right hand, benefiting from the 4i Stimulator, and wearing tennis shoes and the left custom solid spiral ankle/foot orthosis. R. 701. However, he was not taking any pain medication, as the ibuprofen was giving him stomach problems, and he could not pick up the Opana ER until he performed a urine analysis. *Id.* He also could not wear the sacroiliac belt anymore because it did not fit due to his weight gain. *Id.* Dr. Kesten performed the urine analysis so he could pick up his Opana ER trial and prescribed a new sacroiliac belt. R. 705. Moreover, he modified Mr. Garcia's work/activity restrictions: he allowed him to return to work, but instructed him not to lift, push, or pull objects weighing 10 pounds or more, walk or stand more than 10 minutes per hour, or climb stairs or ladders. *Id.*

On July 10, 2008, Mr. Garcia "underwent a bilateral lower extremity electrodiagnostic examination in an attempt further to define the nature of his symptoms." R. 600. Impressions from this included the following:

1. Electrodiagnostic study findings are consistent with a moderately severe left peroneal neuropathy, demyelinating, and axonal in nature, and affecting sensory and motor fibers. Minimal denervation is noted in the left peroneus longus muscle.
2. The clinical significance of the mildly prolonged left tibial motor distal latency is uncertain.
3. There is no evidence of lumbosacral plexopathy, myopathy, or peripheral polyneuropathy.

*Id.*

Mr. Garcia's next evaluation on the record with Dr. Kesten occurred on August 20, 2008. *Id.* He had independently decided to stop his trial of Opana ER, saying it made him feel like he was "hooked on drugs again." *Id.* He did resume taking ibuprofen. *Id.* He also continued to wear tennis shoes and a left custom solid spiral ankle/foot orthosis. *Id.* While he was having technical problems with the 4i Stimulator, and therefore not making use of it, he had received a replacement sacroiliac belt and was wearing it daily. R. 600–01. He had also attended two

8

sessions of lumbosacral percutaneous neuromodulation therapy, but he saw no notable benefit. R. 601.  He still reported severe pain and said the coldness in his lower left extremity was starting to come up to the knee.  *Id.*  Dr. Kesten instructed him to continue his prior interventions and remain on modified work release.  R. 604.

Mr. Garcia then underwent left L4-5 and L5-S1 transforaminal epidural steroid injections on September 25, 2008, which resulted in a "marked exacerbation" of lumbosacral pain.  R. 608. He was then scheduled to undergo diagnostic right L2, L3, L4, and L5 medial branch blocks by Dr. Fuller on October 30, 2008, but he canceled due to pain and swelling in the prior injection site.  R. 607–08.

Mr. Garcia's next evaluation with Dr. Kesten in the record occurred on November 4, 2008.  R. 607.  At this point he had added a left Ossur custom knee brace to his treatment regimen; however, he had not been wearing it recently due to pain in his lumbosacral region when he attempted to put it on.  *Id.*  He had also begun a trial of Lyrica, but it made him dizzy. R. 608.  Dr. Kesten instructed him to discontinue the Lyrica trial and gave him a prescription for Percocet.  R. 611.  Dr. Kesten also instructed him to continue his prior interventions and remain on modified work release.  *Id.*

Mr. Garcia saw Dr. Bharat Desai on February 23, 2009 for an orthopedic surgery consultation.  R. 671.  Dr. Desai performed an ankle x-ray and recommended an ankle arthrotomy, debridement, synovectomy, and possible removal of tibiotalar osteophytes/ exostectomy depending on the surgical findings.  *Id.*  However, Mr. Garcia declined to follow this recommendation.  *Id.*  His appointment with Dr. Kesten on March 3, 2009 was mostly repetitive.  R. 670–75.  Dr. Kesten said he would contact Dr. Desai to see if he could recommend a more conservative surgery.  R. 675.

On May 5, 2009 Mr. Garcia underwent a Functional Capacity Evaluation with occupational therapist Vicki Mallon for the purposes of his Social Security claim. R. 367–412. On a scale from 1 to 10, he reported his back pain at 7.5 and his ankle pain at 8, which he said was typical. R. 375. He passed all five validity measures, which indicates that he put forth consistent effort during testing. R. 376. He also did not show inconsistency with regard to his perceived disability. R. 377–78. Dr. Mallon's impression after conducting a multitude of tests was that Mr. Garcia's "overall demonstrated abilities [were] most consistent with the sedentary to light work category at this time." R. 385.

At his June 16, 2009 appointment with Dr. Kesten Mr. Garcia reported that his back pain was getting worse, and that his left ankle pain hurt "all the time." R. 677. He was continuing his usual treatment regimen, though he had added a Swede-O-Thermoskin AFG ankle/foot gauntlet and still did not have insurance authorization for pool therapy. R. 676–77. At this point Dr. Kesten performed an impairment rating assessment for the purposes of Mr. Garcia's worker's compensation claim; he determined that Mr. Garcia had reached MMI and had a 26% whole person impairment rating for injuries sustained during the work-related accident. R. 683. However, he noted that the figure might need to be apportioned due to a previous 21% whole person impairment rating from an unrelated 1998 work accident. *Id.*

Mr. Garcia took a urine drug test on August 11, 2009 in an attempt to insure he was following his prescription advice. R. 301. The results came back as expected, with Mr. Garcia testing positive for oxycodone, oxymorphone, and marijuana. R. 684. Oxycodone was expected due to his Percocet prescription, oxymorphone is a byproduct of oxycodone, and he had always been forthcoming about his use of marijuana. *Id.* Further, the Prescription Drug Monitoring Program revealed no evidence of "doctor shopping" or "other obvious indiscretions." R. 301.

At his evaluation on September 8, 2009 Mr. Garcia said that his lumbosacral pain was better than "when it was raining really bad." R. 302.

Dr. Kesten then evaluated Mr. Garcia on November 4, 2009. R. 319–26. At this point Dr. Kesten had received documentation from the unrelated work accident in 1998 and apportioned Mr. Garcia's whole person impairment rating accordingly to 16%. R. 322. Mr. Garcia also said he had registered with the Colorado Marijuana Registry per Eric Eisenbud, MD. R. 320. Dr. Kesten still believed him to be at MMI at this time. R. 326.

Mr. Garcia reported to Dr. Vilims for another lumbar sympathetic block on December 18, 2009 but opted out of the procedure. R. 493. He said that his symptoms had changed significantly since Dr. Kesten ordered the block, and at this point he had "only minimal discomfort in his lower extremities and the vast majority of his symptoms [were] axial low back that is worsened with motion and Valsalva type maneuvers." *Id.*

Mr. Garcia continued to see Dr. Kesten on a monthly basis from January to July of 2010, but the records are mostly repetitive. R. 469-541. On March 3, 2010 Dr. Kesten noted that Mr. Garcia had been discharged from his physical therapy program because of multiple absences and his insistence upon doing exercises without supervision or in violation of instructions. R. 494. On April 14, 2010 Mr. Garcia's urine drug test results showed noncompliance due to a negative result for hydrocodone, despite the fact that he was prescribed Norco. R. 520. Through this period Mr. Garcia's treatment regimen did not change much, though Dr. Kesten noted that he still never received insurance authorization for the pool therapy program. R. 539.

On March 8, 2010 Mr. Garcia underwent an MRI of his lumbar spine. R. 502. Results showed "[m]inimal interval increased diffuse L4-5 disk bulging resulting in stable mild central canal narrowing, but slight interval increased moderate-severe bilateral neural foraminal

narrowing abutting the bilateral exiting L4 nerve roots." *Id.*  In response to the MRI, Dr. Kesten

decided that Mr. Garcia was no longer at MMI and referred him to Dr. Andrew Castro to assess

his surgical candidacy.  R. 507.  On April 13, 2010 Dr. Castro opined that due to the "severe"

degenerative changes, surgical intervention may be "reasonably considered."  R. 524.  His plan

included a "one-level lumbar fusion either anterior and/or posterior, but stabilization and

restoration of the disk space with correction of the retrolisthesis would be obvious goals."  *Id.*

However, he wanted to make sure all conservative interventions, such as facet or medial branch

blocks, were exhausted first.  *Id.*  Mr. Garcia declined to pursue the surgery, so Dr. Kesten again

deemed him to have reached MMI.  R. 529.

On April 19, 2010 Mr. Garcia underwent a vocational assessment with Patrick Renfro.

R. 634–45.  Mr. Garcia reported being able to perform many activities of daily living, but that he

often struggled with them and required assistance.  R. 642–43.  He stated that his mother took

care of his cooking, cleaning, shopping, and laundry, and that no yard work was necessary.  R.

643.  He came to the assessment wearing his left lower extremity orthotic, but he did not bring

his cane with him.  *Id.*  He further reported difficulty sleeping at night, ability to sit for no more

than 15 minutes at a time, stand for maybe 10 minutes at a time, and walk only minimally.  *Id.*

He also said he was unable to bend and stoop at the waist or squat, could only occasionally crawl

or reach above shoulder length, he avoided stairs, and he needed to hold onto something in order

to kneel on his right knee.  *Id.*  Pushing and pulling caused back and left lower extremity pain

and he had difficulty with balance, though it had not caused him to fall.  *Id.*  He estimated his

maximum carrying weight to be in the range of 10 pounds or less and reported that he would

have great difficulty using his left foot for operating controls.  *Id.*  Mr. Renfro noted that Mr.

Garcia's stated limitations and restrictions were significantly less than those described by Dr.

Kesten.  R. 644.  In conclusion, and in reliance on Dr. Kesten's restrictions, Mr. Renfro decided

that Mr. Garcia belonged at the modified light physical demand level, and that he was capable of

performing a range of jobs existing in his commutable labor market.  *Id.*  He provided a list of

examples and believed that Mr. Garcia could sustain these jobs on at least a part-time basis.  *Id.*

Mr. Garcia further underwent an integrated psychological and vocational assessment with

Dr. David Zierk on April 28 and May 6, 2010.  R. 615–33.  Dr. Zierk noted that he displayed

involuntary pain expressions when moving, which appeared "genuine and congruent with his

injuries," and that he gave little evidence of conscious attempts at gross symptom exaggeration.

R. 616–17.  In conclusion, due to the combination of his lumbar and ankle pain, educational and

employment background, and potential for symptom exacerbation or reinjury, Dr. Zierk decided

he was "incapable of becoming employed and earning wages in his local labor market."  R. 632–

33.

On June 18, 2010 Mr. Garcia submitted a Function Report to the Social Security

Administration.  R. 247–54.  He stated that he could not "stand, lift heavy objects . . . [or] walk

[without] a cane."  R. 247.  He also said it was very difficult for him to use stairs, he was unable

to bend, and he could not concentrate due to the pain.  *Id.*  When describing a typical day, he said

his mother helps him out of bed, he takes a shower, his mother makes him a meal, he sits or lies

down, and stays home all day.  R. 248.  The report goes on to state that his mother helps him

with everything.  *Id.*  He also described difficulty sleeping and needing to take muscle relaxers.

*Id.*  He described his activities as reading, sitting outside, watching TV, and having conversations

with his family.  R. 251.  He reported being unable to lift over 10 pounds, walk more than 100

feet, or sit for more than 20 to 30 minutes.  R. 252.

Mr. Garcia saw an orthopedic specialist, Dr. Joseph Sever, on August 5, 2010.  R. 542.

Dr. Sever's functional assessment resulted in the following conclusions:

> This applicant has no limitation of use of the upper extremities.  Hand controls can be used without limitation.  He is able to reach above his shoulder.  Lifting up to 25 pounds with each hand could be accomplished for an eight hour period of time.  Due to his low back pain, he is unable to carry objects weighing more than 15 pounds and cannot carry them more than 40 to 50 feet.  No pushing or pulling of the objects should be performed.  No bending or twisting at the waist.  No stooping.  Climbing ladders and stairs should be avoided.  Continuous sitting, for greater than one hour, should be avoided.  Continuous standing and walking, greater than 30 minutes, should be avoided.

R. 545.  Mr. Garcia continued to see Dr. Kesten on a monthly basis through October, 2011; these records are mostly repetitive.  R. 710–821.  Dr. Kesten continues to recommend that he remain off work.  R. 820.

### 3.  **ALJ Opinion**

The Social Security Administration uses a five step process to determine whether a claimant qualifies for disability insurance benefits.  At step one, the ALJ determined that Mr. Garcia had not engaged in substantial gainful activity since October 10, 2003 (his alleged onset date).  At step two, the ALJ found that Mr. Garcia suffered from the following severe impairments: "left ankle disorder, lumbar spine disorder, and a pain disorder due to medical condition."  R. 22.  The ALJ found that Mr. Garcia's mental health issues and knee injury were non-severe.  R. 22–23.  At step three, the ALJ determined that none of these impairments—alone or in combination—met or medically equaled one of the listed impairments.  R. 23.

At step four, the ALJ noted that Mr. Garcia is unable to perform any of his past relevant work, but he decided that Mr. Garcia had a residual functional capacity ("RFC") to

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b).  He can lift and carry 20 pounds occasionally and 10 pounds frequently.  He can stand or walk for 2 hours out of an 8-hour day, sit for 6 hours out of an 8-hour day.  He should not be required to operate foot controls with his left leg.  He can occasionally climb ramps or stairs but never ladders, scaffolds, or ropes.  He should not be required to balance, walk on uneven terrain, twist, kneel or crawl.

14

He can occasionally stoop, bend and crouch.

R. 23–24.

In reaching this conclusion, the ALJ decided that the claimant was "not fully credible" in his description of the intensity, persistence, and limiting effects of his alleged symptoms. R. 27. The ALJ based this determination on his finding that Mr. Garcia demonstrated inconsistencies in his conduct and assertions, had a prospect of personal gain in the outcome of the matter, and exaggerated evidence and magnified symptoms. R. 24-33. The ALJ also asserted that his RFC was similar to the restrictions put in place by Dr. Kesten and the findings from the Functional Capacity Evaluation from May 2009. R. 28–29. The ALJ further noted in his RFC analysis that Mr. Garcia's symptoms and diagnoses were repeatedly referred to as "mild" or "moderate" throughout the record, and that an orthopedic specialist opted to "exhaust all conservative measures before considering surgery." *Id.* The ALJ did not discuss Mr. Garcia's mental impairments in the RFC analysis.

In weighing medical sources, the ALJ decided to give more weight to Dr. Joseph Sever, the consultative orthopedic surgeon who examined Mr. Garcia in August 2010, and Vicki Mallon, the Functional Evaluation Examiner who assessed Mr. Garcia in May 2009. R. 30. The ALJ gave less weight to Dr. Kesten, Mr. Garcia's treating physician, despite the fact that a treating physician is normally entitled to greater weight. *Id.* This decision was made because the ALJ found that Dr. Kesten's records were internally inconsistent, were based on Mr. Garcia's non-credible self-reporting, and were inconsistent with substantial evidence in the record, and that Dr. Kesten was improperly instructed by Mr. Garcia's attorney. R. 30–33. The ALJ gave little weight to Dr. Patrick Renfro's vocational assessment for similar reasons. R. 33.

At step five, the ALJ asked a vocational expert to opine about the employment

opportunities available to a hypothetical person with the residual functional capacity assigned to Mr. Garcia. The expert indicated that such a person would be able to find employment in the national economy as, for example, a ticket counter (68,000 jobs in the national economy) or a telephone quotation clerk (82,000 jobs in the national economy), and accordingly, the ALJ concluded that Mr. Garcia was not entitled to disability benefits under the Act. R. 34-35.

## ANALYSIS

Mr. Garcia makes several arguments on appeal: (1) the ALJ erred by finding his mental impairments were non-severe at step two and by not reconsidering them during the RFC analysis; (2) the ALJ should have given more consideration to Dr. Kesten's opinion that Mr. Garcia was presumptively disabled under the Listings at step three; (3) that the ALJ improperly discounted his credibility and gave too little weight to Dr. Kesten's opinion; and (4) that the ALJ made some undefined error at step five. Mr. Garcia additionally argues that if this Court remands the case, a new ALJ should be assigned.

Overall, the Court finds that the ALJ gave Mr. Garcia's case a thorough review accompanied by a detailed explanation of his decision. However, the Court agrees with Mr. Garcia that the ALJ erred by failing fully to consider Mr. Garcia's mental impairments at step four, and did not adequately analyze and explain the weight given to Dr. Kesten's opinion.

### 1. __Mental Impairments at Step Two and in the RFC__

Mr. Garcia's argument appears to be two-fold. First, he argues that the ALJ's finding at step two contains an "inherent contradiction." ECF No. 13 at 5. He believes, apparently, that it was impossible for the ALJ to find Mr. Garcia's pain disorder due to a medical condition to be "severe" while simultaneously finding his alleged mental impairments to be "non-severe." *Id.* I see no such inconsistency. Even if this was an inconsistent finding, any error would be harmless,

16

because the ALJ did not deny Mr. Garcia disability status at this step but rather continued on to subsequent stages in the analysis. *Cf. Carpenter v. Astrue*, 537 F.3d 1264, 1265-66 (10th Cir. 2008).

Mr. Garcia's second argument is a better one. He suggests that even assuming the ALJ was allowed to determine that the mental impairments were non-severe at step two, the ALJ failed to account properly for these non-severe mental impairments when he determined Mr. Garcia's RFC at step four.

When making RFC findings, the ALJ is required to consider all of the claimant's impairments, including those that are not determined to be "severe." 20 C.F.R. § 404.1545(a)(2). According to Social Security Ruling 96-8P, the RFC assessment "requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the [Psychiatric Review Technique Form]." 1996 WL 374184, at *4 (July 2, 1996). The Court of Appeals for the Tenth Circuit recently reiterated the requirement that ALJs include any and all determinable mental impairments—even non-severe ones—in determining a claimant's RFC. *Wells v. Colvin*, 727 F.3d 1061 (10th Cir. 2013) (holding that "a conclusion that the claimant's mental impairments are non-severe at step two does not permit the ALJ simply to disregard those impairments when assessing a claimant's RFC and making conclusions at steps four and five").

In this case, the ALJ did discuss mental impairments (specifically, depression and anxiety symptoms) at step two. R. 22–23. However, he did not discuss Mr. Garcia's mental impairments at all in his RFC assessment, and he included no limitations from mental impairments in his hypotheticals to the vocational expert or his final RFC determination. In

*Wells*,

> the ALJ determined that Ms. Wells' mental impairments would cause her no more than "mild" limitations in each of the first three functional areas, and "no" limitation in the fourth area.   Under the regulations, this means that her mental impairments were "not severe."   Ms. Wells challenges the ALJ's finding of non-severity, contending it is unsupported by substantial evidence.   She also challenges the ALJ's further conclusion at step four that her mental impairments would impose no limitation on her ability to work, and the ALJ's consequent failure to include any mental limitation in his RFC assessment or in his hypothetical questions to the vocational expert (VE).

*Wells*, 727 F.3d at 1068 (internal citations omitted).  The court went on to note that the ALJ "separately discuss[ed] Ms. Wells's mental impairments to some degree, when assessing her credibility as part of his RFC determination," but the court found this discussion lacked substantial evidentiary support.  *Id.* at 1069.  Here, however, there is no mention of Mr. Garcia's medically determinable depression and anxiety in connection with the ALJ's discussion of his credibility at step four.  Therefore Mr. Garcia's case presents a clearer case for reversal—on this narrow question—than *Wells*.

Mr. Garcia points to the reports of Drs. Disorbio and Zierk as evidence of his on-going mental impairments.  But that evidence is irrelevant to the alleged error here.  The error Mr. Garcia identified was based on the ALJ's own finding that Mr. Garcia had some medically determinable mental issues that caused mild impairments.  That finding alone required the ALJ to include those impairments in his RFC analysis, and presumably in any hypotheticals posed to the VE.

### 2.  **Step Three Listings**

Mr. Garcia also argues that the ALJ erred at step three when he determined that Mr. Garcia did not meet any Listings.  As the Commissioner notes, Mr. Garcia fails to offer any substantive argument as to why he meets Listings 1.01, 1.03, and 1.06.  Those arguments are

therefore waived.  *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012).  The remaining arguments regarding 1.02 and 1.04 are both based on Dr. Kesten's treatment notes and a July 2011 letter written at Mr. Garcia's attorney's prompting.  R. 646.  Generally speaking, these are opinions on matters reserved to the Commissioner, and they are entitled to no special significance. 20 C.F.R. § 404.1527(d).  At the same time, the non-binding Social Security Rulings appear to require that an ALJ take into account "medical source opinions about any issue," including whether a claimant's "impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the [L]istings."  SSR 96-5p, 1996 WL 374183, at *2.

The ALJ's written decision does not confirm that he considered Dr. Kesten's opinion that Mr. Garcia's impairments met any of the Listings.  The ALJ erred with regard to his step three determination by giving no analysis or reasoning beyond citing the "implied medical opinion" of the Disability Determination Services.  R. 23.  The ALJ did not "discuss the evidence and explain why he found that appellant was not disabled at step three," as is required under the Social Security Act.  *Clifton v. Chater*, 79 F.3d 1007, 1009–10 (10th Cir. 1996).  While it is not necessary for the ALJ to discuss every piece of evidence, he must "set out his specific findings and his reasons for accepting or rejecting evidence at step three."  *Id.*

But this is not reversible error in this case.  *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005) (error at step three can be harmless if ALJ conclusively establishes elsewhere in his or her opinion that claimant does not meet the listings); *cf. Dye v. Barnhart*, 180 F. App'x 27, 29 (10th Cir. 2006) (refusing to apply the *Fischer-Ross* harmless error test where an ALJ's conclusory treatment of an impairment at step three was unaccompanied by any findings that conclusively negated the possibility of meeting the Listings in other portions of the ALJ's opinion).

19

In this case, like in Fischer-Ross, the ALJ made findings at later points in his analysis that conclusively establish that Mr. Garcia cannot meet the Listing requirements he and Dr. Kester believe he meets.  First, as the Commissioner points out, Listing 1.02 requires that the claimant be unable to ambulate effectively.  The Listings define this inability as an impairment so severe that ambulating requires the "use of a hand-held assistive device(s) that limits the functioning of both upper extremities."  20 C.F.R. pt. 404, subpt. P, appx. 1, § 1.00(B)(2)(b)(2).  While the ALJ noted that Mr. Garcia uses a cane in one hand (*see* R. 25), there is no evidence that Mr. Garcia requires assistive devices that limit the use of both hands.  Second, the applicable portion of Listing 1.04 requires "positive straight-leg raising test[s]."  20 C.F.R. pt. 404, subpt. P, appx. 1, § 104(A).  In this case, the ALJ noted the multiple inconsistent or invalid results in Mr. Garcia's straight leg raising and lumbar range of motion tests.  R. 25.  Therefore on remand the ALJ need not revisit the issue of whether Mr. Garcia's impairments meet the Listings at step three.

### 3.  <u>Weight Assigned to Various Opinions</u>

#### a.  <u>The ALJ Properly Discounted Mr. Garcia's Credibility</u>

Mr. Garcia also argues that the ALJ's RFC findings are not supported by substantial evidence. This argument has two components. First, Mr. Garcia argues that the ALJ's determination that he was not credible with regards to the intensity, duration, and limiting effects of his symptoms was not closely and affirmatively tied to the substantial evidence of record. "Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence." *Diaz v. Sec'y of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990).  However, "[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Huston v. Bowen*, 838 F.2d 1125 (10th Cir. 1988) (footnote omitted).

A claimant's statements alone are not enough to establish disability.  42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1528(a).  But the Commissioner cannot ignore those statements as they often provide some of the best evidence of pain and other physical limitations.  Therefore the ALJ must evaluate the credibility of the claimant's testimony where that testimony could influence the ultimate finding of disability.  20 C.F.R. § 404.1529(a).

Here, the ALJ determined that Mr. Garcia's testimony about the intensity and limiting effects of his pain was non-credible for a variety of reasons.  He found that Mr. Garcia's conduct was inconsistent with his assertions, pointing out that his stated ability to do self-care chores with difficulty, read, sit outside, watch television, spend time with others, and attend appointments were "activities . . . far greater than one would expect from a completely disabled individual."  R. 24.  He found that Mr. Garcia gave inconsistent testimony about ability to walk (testifying a maximum of one block at the hearing and two to three blocks at the consultative examination) and lift (testifying a maximum of thirty pounds at the hearing and fifteen pounds to the consultative examination).  R. 25.  He found that Mr. Garcia magnified symptoms when he testified at the hearing that he always had to wear an ankle/foot brace and use a cane because at two appointments with Dr. Desai he had only one or the other.  *Id.*  For further evidence of symptom magnification, the ALJ pointed to Mr. Garcia displaying increased lumbosacral pain upon axial loading and having inconsistent or invalid straight leg raise tests and lumbar range of motion.  *Id.*  He found that Mr. Garcia had inconsistent conduct from one time to another due to significant disparity in range-of-motion tests.  R. 25–26.  He also noted that Mr. Garcia had a prospect of personal gain in the outcome of the matter.  R. 26–27.  Later in his opinion, the ALJ stated that Mr. Garcia's lack of a medical record after August 2010 "further erodes [his] credibility," along with his failure to provide all of the records from his workers compensation

case.  R. 29, 33.

Mr. Garcia makes an assortment of arguments against the above factors.  While some might suggest that there is evidence in the record supporting his claims of pain, the existence of that evidence does not overcome the ALJ's well-supported finding that Mr. Garcia's complaints lacked credibility.  *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) ("The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.").  The ALJ did not rely on boilerplate language or inappropriate factors; rather, as demonstrated above, he went through the record and described in detail a long list of problems with Mr. Garcia's evidence based on the factors listed in the regulations.  *See* 20 C.F.R. § 404.1529(c)(2), (3) (listing medical evidence and other factors, respectively).  This is ample support for the ALJ's finding that Mr. Garcia is not entirely credible.

### b.  <u>The ALJ Properly Weighed Dr. Kesten's Opinion</u>

Treating physicians' opinions are generally given controlling weight.  *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003).  However, before assigning a treating physician's opinion controlling weight, "[a]n ALJ must first consider whether the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques." *Robinson v. Barnhart*, 366 F.3d 1078, 1082 (10th Cir. 2004) (quoting *Watkins*, 350 F.3d at 1300).  Next, the ALJ must "confirm that the opinion is consistent with other substantial evidence in the record.  In other words, if the opinion is deficient in either of these respects, then it is not entitled to controlling weight."  *Id.*

Even if a treating physician's opinion is not entitled to controlling weight, it is still entitled to deference and should be weighted using the factors outlined in 20 C.F.R. §§ 404.1527

and 416.927.  *Robinson*, 366 F.3d at 1082 (quoting *Watkins*, 350 F.3d at 1300).  The factors to be considered are:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Id.* (quoting *Watkins*, 350 F.3d at 1301).  Although an ALJ should consider all of these factors, it is not necessary that she explicitly discuss every factor.  *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007).

An ALJ must give specific reasons for the weight assigned to a treating physician's opinion so that subsequent reviewers can determine the weight assigned and the reason for that weight.  *Watkins*, 350 F.3d at 1301.  If an ALJ rejects a treating physician's opinion completely, [he] must then "give specific, legitimate reasons for doing so."  *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004) (quoting *Watkins*, 350 F.3d at 1301).  Moreover, the ALJ is not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability.  *Robinson*, 366 F.3d at 1083.

In this case Mr. Garcia objects to the ALJ's determination that the opinion of Dr. Kesten, Mr. Garcia's treating physician, was not entitled to controlling weight.  R. 33.  Specifically, the ALJ did not give deference to Dr. Kesten's view that Mr. Garcia was limited to not sitting for more than 1 hour at a time, that he would be absent from his workstation every hour for five to 10 minutes, and that he would miss up to four days of work per month.  R. 646–47.

Two initial points need to be made here.  First, Dr. Kesten's opinion that Mr. Garcia is unable to sustain fulltime employment is not deserving of deference: it is not a medical opinion

but a decision about ultimate disability reserved to the Commissioner under 20 C.F.R.

§ 404.1527(d).  Second, the ALJ's opinion appears to perform the required analysis, but it does

so in the wrong order.  Specifically, the ALJ lists several factors militating against giving Dr.

Kesten's opinion much weight before concluding by explaining why Dr. Kesten's opinion is not

entitled to controlling weight.  That is backwards, as far as I can tell.  The regulations and

*Watkins* direct the ALJ to first decide whether the opinion is entitled to controlling weight and

then move on to other weighing factors if necessary.  As explained below, I conclude that an

organizational mix-up like this—when it does not appear to affect the outcome of the case—is

harmless error.[2]

The ALJ determined that Dr. Kesten's opinion was not entitled to controlling weight due

to the fact that it was inconsistent with substantial evidence in the record.  R. 33.  The ALJ points

to statements from both the State Agency review physicians and Consultative Examiner that Mr.

Garcia's limitations would not preclude the performance of substantial gainful employment.  R.

33; *see also* R. 545 (noting "no appreciable gait disturbance" and imposing restrictions only on

continuous walking over thirty minutes and continuous sitting over one hour).  While I might not

reach the same conclusion as the ALJ if I were in his position, I nonetheless view this as more

than a scintilla of evidence in support of his conclusion.

The ALJ provided several reasons why Dr. Kesten's opinion should receive little weight,

albeit in the pages preceding his analysis of the controlling weight issue.  First, the ALJ cited

internal inconsistencies in Dr. Kesten's records with regard to range of motion tests.  R. 30.

Internal consistency, like consistency with the rest of the record, is a factor to consider when

---

[2] I only bother to mention this harmless mix-up at this point because it clarifies that the ALJ did not fail to perform the required two-step analysis under *Watkins*—as Mr. Garcia suggests—but rather that the ALJ erred in the substance of his weighing analysis under step two of the *Watkins* two-step—how much weight to give Dr. Kesten's opinion after deciding that it was not entitled to controlling weight.

deciding how much weight to give a non-controlling opinion of a treating physician. *See* 20

C.F.R. § 404.1527(c)(4); *Pisciotta v. Astrue*, 500 F.3d 1074, 1078 (10th Cir. 2007).  The

remaining reasons cited by the ALJ appear to be inappropriate.  For example, the ALJ also

considered the fact that Dr. Kesten's opinions were based primarily on Mr. Garcia's subjective

complaints.  R. 32-33.  While this might be considered an "other factor" from 20 C.F.R.

§ 404.1527(c)(6), case law generally suggests that, at a minimum, there must be some

evidentiary support for this conclusion.  *See Langley v. Barnhart*, 373 F.3d 1116, 1121 (10th Cir.

2004) ("The ALJ [must have] a legal or evidentiary basis for his finding that [a treating

physician's] opinions were based merely on Plaintiff's subjective complaints of pain.");

*McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002) ("in choosing to reject the treating

physician's assessment, an ALJ may not make speculative inferences from medical reports and

may reject a treating physician's opinion outright only on the basis of contradictory medical

evidence and *not due to his or her own credibility judgments, speculation or lay opinion*")

(citation omitted) (emphasis in original).

    Another factor contributing to the ALJ's determination that Dr. Kesten's opinion

deserved little weight was the ALJ's perception that the doctor's opinions had been affected by

his communications with Mr. Garcia's attorney.  R. 31.  If an attorney persuaded a physician to

alter his medical opinions in a manner than benefitted the claimant's case, then I agree that that

would be a good reason to discount the opinion.  The ALJ wrote, "I must note that the doctor's

favorable testimony was given only after he received communications from the claimant's

attorney that suggested the topics to address in order for the claimant to receive disability

benefits." *Id.*  The problem is, the attorney's communication, as described by the ALJ, could be

appropriate (merely describing the requirements of the Social Security rules) or inappropriate,

and even if one assumes the worst, it does not necessarily follow that the doctor improperly modified his opinions as a result.

It is possible that Dr. Kesten's opinion deserves little weight.  However, the ALJ's analysis of this issue is not convincing.  On remand, the ALJ should adhere closely to the framework established in *Watkins* and should focus only on relevant factors when determining what weight to give to Dr. Kesten's opinion.  That includes analysis of those factors that appear to weigh in favor of Dr. Kesten's opinion such as the length and nature of the treatment relationship with Mr. Garcia.[3]

### 4.   **Alleged Error at Step Five**

Mr. Garcia also argues that the ALJ's step five findings were not supported by substantial evidence.  He offers, however, no explanation of this argument other than merely repeating his earlier contentions that the ALJ erred in finding Mr. Garcia's testimony not to be credible and in improperly weighing Dr. Kesten's opinion.  Because Mr. Garcia made no effort to develop this argument, and because I remand the case on other grounds, I decline to address this portion of his appeal.

### 5.   **New ALJ on Remand**

Mr. Garcia's final argument is that his case should be assigned to a new ALJ on remand.  Mr. Garcia has failed, however, to demonstrate the requisite prejudice or partiality that triggers the assignment of a new ALJ.  See 20 C.F.R. § 404.940 (stating that an ALJ should not preside over a hearing if he is "prejudiced or partial with respect to any party or has any interest in the matter pending for decision").  ALJs are presumed to be unbiased; that presumption is only overcome by showing that the ALJ's behavior was "so extreme as to display clear inability to render fair judgment."  *Rollins v. Massanari*, 261 F.3d 853, 857-58 (9th Cir. 2001).  Nothing in

---

[3] The ALJ made no mention of these factors in his opinion.

the record here demonstrates bias, much less the extreme behavior needed to require a new ALJ.

**ORDER**

The case is REVERSED and REMANDED to the ALJ for further findings pertaining to the effect of Mr. Garcia's mental impairments on his RFC and for a reweighing of Dr. Kesten's opinion evidence in compliance with the two-step analysis explained in *Watkins*.


DATED this 13th day of August, 2014.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge